(No. 6721. October 26, 1939.)

NORTH SIDE CANAL COMPANY, LIMITED, a Corporation, v. IDAHO FARMS COMPANY, Respondent.

[96 Pac. (2d) 232.]

Wayne A. Barclay, Frank L. Stephan, J. H. Blandford and Richards & Haga, for Appellant.

Edwin Snow and A. F. James, for Respondent.

Dana E. Brinck, Albert Olsen and Pasco B. Carter, *Amici Curiae.*

GIVENS, J.—This action grows out of the vicissitudes of a so-called "Carey Act" project organized and developed under the correlated federal[1] and state[2] statutes. For those interested an extended history of the project, adverted to and delineated at length by the respective parties herein, may be found in the cases cited in the appended footnote,[3] but the point involved herein does not depend upon or require a detailed reference thereto.

Therefore, going immediately to the ultimate question, these facts are alone pertinent and controlling.

Respondent, by various transactions unimportant herein, is the successor in interest of the original construction company and its bondholders, and appellant is the operating company organized in the first instance by the construction company for the purpose of transferring ownership of the system to the entrymen. Respondent, between January 23, 1915, and April 17, 1928, acquired, by purchase at foreclosure sale,[4] bidding the full amount due and unpaid, or for like full amount then due, by deed in lieu of foreclosure, the land and appurtenant Carey Act water rights of certain

---

[1] Chap. 301, sec. 4, 28 Stat. 372, 422, 43 U. S. C. A. 641 et seq. (Aug. 18, 1894); amended by Act of June 11, 1896, chap. 420, sec. 1, 29 Stat. 413; Act of March 3, 1901, chap. 853, sec. 3, 31 Stat. 1188; Act of January 6, 1921, chap. 10, 41 Stat. 1085.

[2] Title 41 chapters 17 to 21, inclusive, Idaho Code Annotated.

[3] *Vinyard v. North Side Canal Co.,* 38 Ida. 73, 223 Pac. 1072; *Vinyard v. North Side Canal Co.,* 47 Ida. 272, 274 Pac. 1069; *Idaho Farms Co. v. North Side Canal Co.,* 24 Fed. Supp. 189; *Bennett v. Twin Falls North Side Land & Water Co.,* 27 Ida. 643, 150 Pac. 336; *Collins v. Twin Falls North Side Land & Water Co.,* 28 Ida. 1, 152 Pac. 200; *Lincoln County v. Twin Falls North Side Land & Water Co.,* 23 Ida. 433, 130 Pac. 788; *McClung v. Twin Falls North Side Land & Water Co.,* 33 Fed. (2d) 478; *Reynolds v. North Side Canal Co.,* 36 Ida. 622, 213 Pac. 344; *Andrews v. North Side Canal Co.,* 52 Ida. 117, 12 Pac. (2d) 263; *North Side Canal Co. v. Twin Falls Canal Co.,* 12 Fed. (2d) 311.

[4] Sections 41–1726 to 41–1735, I. C. A.

individual entrymen who failed to pay in full to the construction company or its successors the contract purchase price of their water rights. The land was evidently (and we take as a premise herein) patented prior thereto by the United States to the state and in turn by the state to the individual entrymen. (Secs. 41–1719 and 41–1722, I. C. A.) We are concerned, therefore, only with entries now completed by patent to the land and sale thereof, with appurtenant water rights, to respondent, not with cancelation or withdrawal from entry. (Sec. 41–1723, I. C. A.) Thus any application of *Idaho Irr. Co. v. Dill*, 25 Ida. 711, 139 Pac. 714, is entirely eliminated.

Subsequently to respondent's so acquiring the respective parcels of land and appurtenant water rights, appellant operating company levied assessments thereon for maintenance and operation of the canal system during the years succeeding 1928. Respondent resists the enforcement thereof since 1931, claiming it has a reserved or underlying, prior, superior and paramount lien under section 41–1726, I. C. A., for its construction costs, that the contracts between the construction company and the state,[5] and between the construction company and entryman,[6] made the water stock held

---

[5] The State contract provided that the construction company was to hold the entire authorized capital stock of appellant for transfer to entrymen, and provided that: "said shares of stock, however, shall have no voting power and shall not have force and effect until they have been sold or contracted to be sold to purchasers of land under this irrigation system."

[6] The contracts between the entrymen and construction company for purchase of shares of water stock in appellant company contained this provision:

"The purchaser hereby covenants and agrees that upon default in the payment of any of the payments above specified, or of the interest thereon, or any annual charge, toll or assessment, for the operation and maintenance of the irrigation system hereinbefore provided for, or upon his default in performing any of the conditions hereof, the Company may declare the entire amount of the unpaid purchase price for said water rights due, and may proceed either in law or equity to collect the same, with interest, and to enforce any lien which it may have upon the water rights hereby contracted, or upon the lands to which said water rights are dedicated or may at its option proceed

by the construction company nonassessable for maintenance costs,[7] and that such lien exists concurrently with its ownership of the land and water rights to the same extent and with like effect as though its predecessor construction company had never issued or sold the water rights in the first place, and therefore such assessments may not be enforced; evidently, however, respondent concedes if it uses the water it must, and has in fact paid therefor when using water, but insists it may at its discretion or pleasure not use water and contends it has not done so, in large part, because the particular parcels of land foreclosed are of poor quality or incapable of successful irrigation or cropping.

Appellant takes the position that respondent now owns and holds the land and appurtenant water rights the same as any other purchaser at foreclosure proceedings. Respondent frankly takes the stand that it is in a different position than any other purchaser at such foreclosure proceedings,

to enforce any remedy given by the laws of Idaho to the Company against the purchaser.

"And the purchaser hereby further covenants that he will and by these presents does hereby grant, assign, transfer and set over by way of mortgage or pledge to the Company to secure the payments of the amounts due and to become due on the purchase price of the water right hereby contracted to be sold and to secure the full performance of all of his covenants and agreements herein contained, any and all interest, and all rights which he now has or which may hereafter accrue to him under his contract with the State of Idaho for the purchase of the lands to which the water rights hereby contracted for are dedicated together with any and all interest in the said water rights."

[7] The by-laws of appellant operating company provided:

"Section 5. All the stock of this Corporation shall be issued to and held by the Twin Falls North Side Land & Water Company (predecessor of respondent), its successors or assigns, in order to enable it to deliver shares of stock to purchasers of water rights, but said shares of stock shall have no voting power and shall not have force and effect and shall not be assessable for any purpose either for maintenance or otherwise, until they have been sold or contracted to be sold to entrymen or owners of land under the irrigation system, and all assessments, maintenance and other charges must be paid by the purchaser or owner of the stock and not by the Twin Falls North Side Land and Water Company, its successors or assigns."

basing such contention on the claimed continuation of its lien under section 41–1726, I. C. A., until it is paid in money in full for the original contract cost of construction and that it owns and holds the land and appurtenant water rights not in complete satisfaction of its contract construction costs but as a kind of trustee merely for resale.

Appellant sued to foreclose its lien, seeking to quiet its title as against respondent, and respondent asserted its lien to be prior, asking that appellant take nothing. The decree entered provided that the lands and water be sold at foreclosure and respondent's claims be first satisfied and then appellant's, no doubt to be thus consistent with respondent's contention it has a lien.

Respondent urges that this entire matter has been conclusively settled in its favor by *Portneuf-Marsh Valley Canal Co. v. Brown*, 274 U. S. 630, 47 Sup. Ct. 692, 71 L. ed. 1243, and by *Idaho Farms Co. v. North Side Canal Co.*, 24 Fed. Supp. 189, by the court's holding therein that the construction company's lien is superior to that of the operating company.

This begs the question because it is not which lien is superior but whether respondent having acquired the land and water rights at foreclosure sale (or by voluntary deed in lieu thereof), thereby becoming owner, nevertheless still has a lien, in other words, may an ordinary construction corporation have a lien on its own property?

The situation in the Portneuf-Marsh case, *supra,* differs factually from that herein in that therein only the stock in the operating company was involved, not the land and water rights as such purchased by the construction company's successors and their liability for enforceable maintenance assessments. "By stipulation the decree of foreclosure was limited to the stock in the operating company acquired by (the operating company on foreclosure of its lien for failure of the entryman to pay maintenance assessments)." (274 U. S. 630, 635, 47 Sup. Ct. 692, 693, 71 L. ed. 1243, 1264.)

Respondent argues this makes no difference as the court broadly considered the relative lien priorities, but while therein the construction company had acquired some of the

land and water rights prior to the levying of the operating company assessments and the point involved therein may have been suggested to the court, there is no discussion of it in the opinion and the most that can be said for the holding therefore is that the court took as a premise, *without ratio decidendi* that the construction company had a lien and then proceeds to hold its lien superior to that of the operating company.

*Idaho Farms Co. v. North Side Canal Co., supra,* on issues identical with those herein and the underlying facts fully and clearly set forth, while discussing the question herein at length, evidently proceeded on the theory the conclusions of the United States Supreme Court in the Portneuf-Marsh case was binding on it, stating:

"Under those circumstances it was contended by the operating company that the foreclosure proceedings and quitclaim deeds operated to extinguish the Carey Act construction company's lien for construction charges, and that thereafter the property thus acquired and held became subject to maintenance liens precisely as any other land and water right of the project. The issues presented and decided and the status of the respective parties are identical in every respect, and that being the case the Supreme Court having decided that after as well as before the foreclosure of the settlers' water contracts, a Carey Act construction company and its bondholders hold the repossessed property exempt from assessment liens of the operating company precisely as it did before the unsuccessful sale to the settlers, it is decisive of the present case, unless the plaintiff is estopped by its conduct from maintaining the position which it now takes and have waived its rights to invoke the principle recognized by the Supreme Court exempting its property from maintenance and operating charges."

But this disposition imputed to the supreme court does not at all appear in the supreme court opinion.

The question then, so far as the Portneuf-Marsh case is concerned, was not juristically determined therein.

Respondent's error in urging reliance on the Portneuf-Marsh case is, as aptly stated by it, that of seeking to wrench

from its context language employed by a court in the decision of a specific question (therein priority of a lien, not whether the construction company had a lien concurrently with ownership) and urging such language in the solution of a wholly different question, quoting:

"Each case must be construed with reference to the circumstances of that case, and the questions actually under consideration, and limited to those points of law raised by the record, considered by the court, and necessary to the determination of the case. (Black's Law of Judicial Precedents, sec. 11; *Bashore v. Adolf,* 41 Ida. 84, 238 Pac. 534, 41 A. L. R. 932.)" (*Stark v. McLaughlin,* 45 Ida. 112, 261 Pac. 244.)

It may be contended that it was "necessary to the determination of the Portneuf-Marsh case that the construction company had a lien" but the court assumed that, without discussion or judicial determination as to how the construction company could have ·a lien on its own property in the absence of any statute to that effect.

"Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (*Webster v. Fall,* 266 U. S. 507, 45 Sup. Ct. 148, 69 L. ed. 411.)

The brief of *amici curiae* refers to specific portions of the transcript of the Portneuf-Marsh case in the appeal to the United States Circuit Court of Appeals (5 Fed. (2d) 895), asserting that in a large part the acquisition by the construction company's successors therein of the lands and water appurtenant thereto was after the assertion of lien by the operating company. Respondent by reference to other parts of the same transcript, insists rather to the contrary and also that more than a majority of the land and appurtenant water rights had been acquired at foreclosure or by deed in lieu thereof by the construction company prior to the levy of the operating company's assessments.

Appellant also urges that only water stock in the operating company foreclosed by the operating company was involved. We place our conclusion that that case is not in point on the

fact that regardless of whether the question of the continuing existence of the construction company's lien on lands foreclosed by it was or was not placed before the court, the opinion shows that the court nowhere discussed or decided the question, as against appellant's contention herein, that the construction company had, after the operating company's liens had been asserted against the lands, a continuing lien. The court therein merely considered the relative priorities of the two liens, that of the construction company and the operating company.

Respondent asserts to construe section 41–1726, I. C. A., contrary to its theory would render such statute unconstitutional in that the operating company's right to assess for maintenance and operation was granted by the legislature after section 41–1726, I. C. A., *supra*, and thus would result impairment of the obligation of respondent's contract for full reimbursement for its construction costs.

There is no impairment because the operating company's assessments or lien therefor or its enforcement in no way affects the *lien* of the construction company or its statutory enforcement or satisfaction; they only affect the construction company's property after it acquires title by foreclosure or otherwise, when it holds as any other owner. All that the construction company was ever entitled to in default of the payment of its costs was to have the land and water of the defaulting entrymen sold, and it could recover only what was bid in and paid at the sale (not exceeding the balance due), or the property, if it itself bid in the property. (Secs. 41–1728 to 41–1735, I. C. A.; *Rogers v. Thomas*, 38 Ida. 802, 226 Pac. 165.)

" . . . . Any lien created for the original cost of construction, together with interest thereon, is subject to foreclosure and sale by a procedure somewhat analogous to the general procedure for the foreclosure of mortgages, as provided for in section 1629 *supra*, . . . .

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"It is apparent that the legislature intended to fully protect the construction company to the extent that it be reimbursed for the moneys expended in the construction of the

works, together with reasonable profit on the investment. To this end it provided the statutory liens heretofore defined and a complete, exclusive statutory procedure for the foreclosure of these liens." (*Adams v. Twin Falls-Oakley Land & Water Co.*, 29 Ida. 357, 373, 374, 161 Pac. 322.)

All the argument *pro* and *con* as to merger or non-merger applies only to subordinate liens, to cut off which the superior lien will not merge in the title of the purchaser at foreclosure sale. The liens of the operating company herein asserted came into play only after the respondent company, as successor of the construction company, had acquired title by foreclosure proceedings (or deeds in lieu thereof) and the legal and equitable titles have merged. (*Northwestern & Pacific Hypotheekbank v. Nord*, 56 Ida. 86, 50 Pac. (2d) 4.)

By deed or foreclosure sale respondent acquired something it never had before, and which it did not create or convey in the first place, namely, the land. Under the Carey Act the construction company builds and constructs an irrigation system and sells water rights thereon; the land is sold by the state, and while the construction company has a lien thereafter on both land and water it does not own them until foreclosure for default of the entrymen, and then forecloses on both, not just on the water.

"Any person, company or association, furnishing water for any tract of land, shall have a first and prior lien on said water right *and land upon which said water is used,* . . . . " (Italics ours.) (Sec. 41–1726, I. C. A.)

Respondent calls attention to the fact that section 41–1726, I. C. A., does not limit the lien to time of foreclosure, but gives one until payment. Payment, however, in case of default is, under sections 41–1728 to 41–1735, I. C. A., inclusive, accomplished completely by foreclosure or deed in lieu thereof. Contrary to its contention respondent is a voluntary purchaser at foreclosure as much as anyone forced to buy its security to effect payment of the obligation, and is charged with having as much knowledge of the value or worthlessness of the land as the entrymen. The debt is

*in rem* only, since no deficiency may be docketed against the entryman.

To conclude the legislature thought or considered that in all foreclosure cases the land and water would bring enough to pay the lien in full, would be to overlook entirely the history of irrigation in the arid states, both before and after 1895, and the statute does not hint at repeated recapturing and resales or extending the lien beyond foreclosure.

In the first instance the construction company did not have to undertake the project and was as capable as the entrymen of determining whether the land and water would be of sufficient value to afford adequate security and insure, if foreclosure became necessary, the return to the construction company the cost of construction, which undoubtedly included prospective or hoped for profit. The construction company is not sacrosanct and under the statute is given a superior lien but no more, and has no reason to claim as a purchaser greater rights than any other lien holder compelled by force of circumstances to take the property, security for the lien. It is nothing but a construction company, and the statutes nowhere put it in any other class favored or otherwise than any other body corporate.

"It is clear from the provisions of said Carey Act and the amendments thereto, and the statutes of the state applicable to said act, that companies like the defendant are treated by the state as, and are in effect nothing but construction companies engaged in constructing irrigation works under contract with the state, and their remuneration is limited by the provisions of the Carey Act and the provisions of sec. 1629, Rev. Codes, to the actual cost of construction and the necessary expense of reclamation and reasonable interest thereon.

"It has been the custom of the state land board at the time a contract is entered into to fix a sum which shall represent such actual cost of construction and this practice has been upheld by this court in the case of *Idaho Irr. Co. v. Pew*, 26 Ida. 272, 141 Pac. 1099. It is apparent that the law does not intend that profit shall accrue to the construction company, and it is clear that the construction company

is not the owner of the works constructed by it nor of the water right connected therewith, for under the provisions of said sec. 1629, the construction company is given a first and prior lien on the water right and land upon which the said water is used for all deferred payments for such water right, and under no reasonable construction of such law can it be held that the construction company is the owner of either the water right or the system, but is only given the right to sell them for the purpose of reimbursing it for the cost of construction.

"The only means of remunerating the construction company is by the sale of the water rights. The state land board fixes the price per acre to be charged for such water rights by dividing the cost of reclaiming the land by the number of acres to be reclaimed, and when all of the water rights connected with such system have been disposed of, the construction company has, at least in theory, been reimbursed for its outlay; provided that purchasers of such water rights pay the purchase price for them. The water rights unsold cannot be considered in the ordinary sense as assets of the construction company, since water rights remaining unsold represent rather a liability of the construction company which can only be met by the sale of the water rights as provided by law." (*Idaho Irr. Co., Ltd., v. Lincoln County,* 28 Ida. 98, 106, 107, 152 Pac. 1058; *State v. Twin Falls etc. Water Co.,* 30 Ida. 41, 166 Pac. 220.) The construction company is expressly empowered to purchase at foreclosure sale. (Sec. 41–1734, I. C. A.)

The trustee status of the construction company as claimed by respondent (if any) certainly does not exist after foreclosure (or receipt of deed in lieu thereof). (*State v. Twin Falls etc. Water Co., supra; Idaho Irr. Co. v. Lincoln County, supra; Adams v. Twin Falls-Oakley L. & W. Co., supra.*) The construction company is not, as argued by respondent, in any true sense a "construction or selling agent of the state"; section 41–1712, I. C. A., expressly negatives such proposition:

"Nothing in this chapter shall be construed as authorizing the department to obligate the state to pay for any

work constructed under any contract, or to hold the state in any way responsible to settlers for the failure of contractors to complete the work according to the terms of their contracts with the state.''

Respondent asserts that the particular parcels of land are almost valueless and that no water has in fact been used on the bulk thereof by respondent. It as owner, must, however, pay maintenance assessments as other Carey Act segregation owners whether or not the water is used. (*Aberdeen-Springfield Canal Co. v. Bashor*, 36 Ida. 818, 214 Pac. 209.) The statute does not place the land and water back in its original status whereunder the construction company was not required to pay maintenance assessments on water stock not issued and land not sold.

Respondent further argues it may hold the land and water for resale only and may not sell at any increase over the original price. No such restrictions are placed by the statute (sec. 41–1735, I. C. A.) on what the purchaser at foreclosure may do with the property after he receives the sheriff's deed and the period of redemption has expired, and statutes compelling a construction company to sell its water within any time limit do not apply after purchase at foreclosure or by deed. (*Adams v. Twin Falls-Oakley Land & Water Company, supra; State v. Twin Falls etc. Water Co., supra; State v. Twin Falls L. & W. Co.*, 37 Ida. 73, 217 Pac. 252; *Boley v. Twin Falls Canal Co.*, 37 Ida. 318, 217 Pac. 258.)

Respondent broadly asserts the reason for the continued lien of the construction company after the foreclosure of the lien is that it may be paid in money, that capital would not have been attracted unless insured protection. That is, that if the land and water rights do not sell to other purchasers for enough to pay for the cost of construction the land may be repeatedly sold to itself *ad infinitum*. By its lien to be once satisfied it had as much protection as the entrymen.

In the first place and before the original sale of the land and water rights the construction company can be compelled by *mandamus* to sell the water rights, but when all

the land available has been sold no further sales of water rights can be compelled (*State v. Twin Falls Canal Co.*, 21 Ida. 410, 121 Pac. 1039, L. R. A. 1916F, 236), and there is no decision which holds that after foreclosure the construction company can be compelled to sell the foreclosed land and water. Transfer of the place of use of the water would be governed by the same rules applicable to any other water user and the statutes place no restriction on the construction company not on any other user.

The construction company gave a trust deed November 1, 1907, on all its property, which would include the construction company's rights in the project as it was built, developed and completed, and it would also include the construction cost contracts to secure the bonds issued by it. Respondent is now the successor in interest to the construction company and the bondsmen. When the construction company, or its successors in interest purchased the respective parcels of land and appurtenant water at foreclosure such land and water rights were of course held by the construction company or its successors in interest for the benefit of the bondholders, or by respondent as successor of the bondholders' interest. But after such foreclosure sale the bondholders or the successors to the construction company, so far as subsequent maintenance charges are concerned, held in no different position than any other purchaser at foreclosure sale.

Many other cases dealing with various phases of the Carey Act statutes, federal and state, are referred to[8] but none

---

[8] *Blaine County Canal Co. v. Hansen*, 49 Ida. 649, 292 Pac. 340; *Carlson-Lusk Hardware Co. v. Kammann*, 39 Ida. 654, 229 Pac. 85; *Federal Land Bank v. Bissonnette*, 51 Ida. 219, 4 Pac. (2d) 364; *Sanderson v. Salmon River Canal Co.*, 45 Ida. 244, 263 Pac. 32; *Continental & Commercial T. & S. Bank v. Werner*, 36 Ida. 601, 215 Pac. 458; *State v. Twin Falls Canal Co.*, 21 Ida. 410, 121 Pac. 1039, L. R. A. 1916F, 1, 236; *Idaho Irr. Co. v. Lincoln County*, 28 Ida. 98, 152 Pac. 1058; *Columbia Trust Co. v. Eikelberger*, 42 Ida. 90, 245 Pac. 78; *State v. Twin Falls Salmon River Canal Co.*, 30 Ida. 41, 166 Pac. 220; *Bennett v. Twin Falls etc. Co.*, 27 Ida. 643, 150 Pac. 336; *Nelson v. Parker*, 19 Ida. 727, 115 Pac. 788; *Bashore v. Adolph*, 41 Ida. 84, 238 Pac. 534, 41 A. L. R. 932.

have a sufficiently direct bearing hereon to be enlightening, hence a discussion or analysis thereof would serve no good purpose.

Nothing in the statutes indicates in the slightest that respondent, after its purchase at foreclosure of its lien (or deeds acquired in lieu of foreclosure) retains its lien or occupies any different position than any other purchaser after sheriff's deed has issued.

The judgment of the trial court is accordingly reversed and the cause remanded with instructions to enter judgment of foreclosure for appellant against respondent on unpaid operation and maintenance assessments levied subsequent to 1931.

Ailshie, C. J., and Budge, Morgan and Holden, JJ., concur.

---

## ON PETITION FOR REHEARING.

### (December 2, 1939.)

GIVENS, J.—Respondent's petition for a rehearing in addition to again stressing the unconstitutionality of our construction of the statutes relative to the construction company's lien (which point has been sufficiently disposed of in the original opinion), urges that appellant became bound by a contract of November 1, 1926[1] to acknowledge, under the Portneuf-Marsh case, *supra,* respondent's lien as superior and continuing after its acquirement of the lands involved herein.

With regard to this contract the court found:

[1] Defendant's Exhibit 24:

"THIS AGREEMENT, Made and entered into this first day of November, 1926, by and between NORTH SIDE CANAL COMPANY, Limited, a corporation, hereinafter designated as the party of the first part, and TWIN FALLS NORTH SIDE LAND AND WATER COMPANY, a corporation, hereinafter referred to as the party of the second part.

"WITNESSETH:

"THAT, WHEREAS, the party of the first part now owns and operates that certain irrigation system heretofore constructed by the party

"That on or about November 1, 1926, the parties hereto entered into a certain written contract, to-wit, defendant's Exhibit 24, which fixed their respective rights and liabilities pertaining to the respective liens claimed by each. That by reason of the execution of said contract and by reason of all the facts and circumstances in this case there is no estoppel against defendant's claims in this suit."

Neither the conclusions of the trial court or the decree indicate they were in any degree based upon this finding, and we did not so consider they were. It is significant that while the court found respondent was not estopped by the contract to assert its lien as continuing, the court did not find appel-

of the second part herein under the provisions of those statutes of the United States known as the Carey Act, and the Statutes of Idaho pertaining thereto, and commonly known as the 'North Side Project,' and

"WHEREAS, said party of the first part has, in the past, claimed and will hereafter claim liens for unpaid maintenance assessments of the kind and character provided in Chapter 138, Idaho Compiled Statutes of 1919, as amended by the Idaho Session Laws of 1925, Chapter 107, against those lands within said project whereon the annual maintenance assessments have not been paid or will not in the future be paid, and

"WHEREAS, the party of the second part or its assigns or successors in interest has claimed and will hereafter claim liens of the character provided for by Article V, Chapter 136, of the Idaho Compiled Statutes of 1919, and the Statutes of the United States of America, for unpaid construction charges against those lands whereon the construction charges have not been paid or will not be paid in the future, and

"WHEREAS, in many instances the parties hereto do now claim or will hereafter claim liens of the character above described against the same pieces or tracts of land, and

"WHEREAS, some uncertainty and confusion exists as to the relative priority of the liens of the parties hereto, and there is at present an apparent conflict between the decision and holding of the Courts of the United States of America on the one hand, and the Courts of the State of Idaho, on the other hand, as to this question of the relative priority of the said liens, and

"WHEREAS, certain litigation is now pending, both in the Federal Courts and the Courts of Idaho, between certain interests (not parties to this agreement) relating to the respective priority or constitutionality of said respective liens, or which may hereafter be instituted between the parties hereto or others, and which it is expected will be decisive of the

lant was estopped to urge the contrary and no such implication is inferable therefrom. However, in view of respondent's courteous urgency it is not amiss and perhaps necessary to affirmatively consider the effect, if any, of this contract.

Appellant's witness, Mr. Hurlebaus, its secretary and for a time respondent's assistant secretary, testified in regard to this contract that:

"Q. State to the Court, Mr. Hurlebaus, if the provisions of the original of this contract, Defendant's Exhibit No. 24, were carried out and performed?

"A. Certain portions of them were carried out, but the whole contract became dead eventually because there was a

---

present uncertainty as to the relative priority or constitutionality of said liens.

"NOW, THEREFORE, by reason of this situation and for the purpose of preserving and maintaining for each party hereto all of the legal rights, remedies, and privileges to which they may be entitled, and for the purpose of ultimately arriving at a settlement of the relative rights of the parties hereto with as little inconvenience and expense as possible, the parties hereto do hereby mutually covenant and agree as follows:

"(1) That the party of the first part shall cause to be released and discharged on the proper public records all liens or claims of liens by it claimed or filed against any and all lands within said North Side Project which shall come under the following classifications:

"Where the party of the second part, its successors or assigns has heretofore, is now securing, or will in the future, secure title by foreclosure of Carey Act water contracts; or by foreclosure of a mortgage taken in lieu of a Carey Act water contract; or by deed taken in lieu of, or in extinguishment of, a Carey Act water debt.

"THAT the said releases mentioned above shall be executed and filed when the party of the second part, its successors or assigns, finally acquires title to any of the lands mentioned in the preceding paragraph.

"(2) That should the final decision of the Courts of the United States of America be in any case presenting for decision the issue of the relative priority or constitutionality of liens of the kind and character claimed by the respective parties hereto, whether by decision of the Supreme Court of the United States of America, or by the United States Circuit Court of Appeals (if the case be not appealed to the United States Supreme Court, or if said Supreme Court declines or refuses to take jurisdiction thereof) or by the United States District Court (if no appeal be taken therefrom) that a lien of the kind and character claimed by the party of the second part herein is prior or superior to a lien of

limit of three years. Item '12' here is to start some action before the three years expired. We were back to our old procedure, which is the same which is shown in this book.

"Q. So you ended up following the same old practice that had prevailed?

"A. Yes sir."

The former procedure referred to by Mr. Hurlebaus was payment by respondent between 1926 and 1931 of maintenance charges on some if not all the parcels of land involved herein.

Respondent's witness, Mr. Parry (at different times counsel for the respective parties herein, separately and jointly,

the kind or character claimed by the party of the first part herein, that then and in that event the party of the first part will:

"(a) Cancel as against the party of the second part, its successors or assigns, and declare null and void, all sums of money, otherwise due it by reason of the assessments represented by the liens which have been released of record as provided in paragraph (1) hereof,

"(b) Cause to be released and discharged on the proper public record, all liens or claims of lien by it claimed or filed against all other lands within the said North Side Project, which come under the following classifications:

"Where the party of the second part, its successors or assigns does, in the future, secure title by foreclosure of a Carey Act water contract; or by foreclosure of a mortgage taken in lieu of the Carey Act water contract; or by deed taken in lieu of and in extinguishment of a Carey Act water debt.

"That the releases last hereinabove mentioned shall be executed and filed when the party of the second part, its successors or assigns, finally acquires title to the lands mentioned in the last preceding paragraph, and at the same time satisfy the debt of the assessments represented by said liens insofar only as the party of the second part, its successors or assigns, is concerned.

"(3) That the party of the first part shall, at the time of making any of the releases mentioned in paragraphs (1) and (2) hereof, cause a stock certificate to be issued in the name of the party of the second part, its successors or assigns, as the case may be, covering the lands upon which such releases are executed.

"(4) That the releases agreed to be made by the party of the first part in paragraphs (1) and (2) hereof shall be made only in the event of foreclosure or voluntary deeds of the kinds mentioned in said paragraphs had or taken in an attempt to collect the original water contract

with their full knowledge, acquiescence and approval), with reference to such payments made by respondent after the contract of 1926, and prior to 1931, stated:

"Q. It has been testified here that during the period of time up to 1931 that the defendant company has paid maintenance on all these lands originally involved in this suit, will you state the circumstances?

"A. Those payments were made for various reasons, it has been, or was the policy of the Bondholder's Committee all the time and was carried out by Mr. Shepherd and representatives in Idaho to affect—lean over backward, to preserve friendly relations with Canal Company, as Mr. Hurlebaus explained,

debt and shall not extend or apply to any subsequent foreclosure resulting from resale of such lands and water rights.

"(5) That if the final judgment of the Courts of the United States of America, as defined in paragraph (2) above, be in a case defined as in paragraph (2) above, that a lien of the character of that claimed by the party of the first part herein be prior or superior to the lien claimed by the party of the second part herein, that then the party of the second part shall pay to the party of the first part all unpaid maintenance, together with accrued interest thereon computed at the rate of six per cent (6%) per annum from the date the same was due, levied and assessed against all lands within said North Side Project which come under the classification in paragraphs (1) and (2) hereof.

"(6) That if the final judgment of the Supreme Court of the State of Idaho should be, in any case presenting for decision the issues of the relative priority or constitutionality of liens such as are claimed by the parties hereto, identical with or concurrent with the final decision of the Courts of the United States of America (as defined in paragraphs numbers (2) and (5) hereof), then the liens of the party of the first part shall be released and disclosed or paid as the case may be, the same as provided in paragraphs numbers (1) and (2) and (5) hereof.

"(7) That in the event the final judgments of the Courts of the United States of America and of the State of Idaho should be, in cases presenting for decision the relative priority or constitutionality of liens of the kind and character claimed by the parties hereto, conflicting and/or opposite, that then and in that event either party hereto shall have and is hereby given the right and privilege to bring and maintain such legal action or actions as each may deem fit and proper for its purpose.

"(8) It is understood and agreed that in all foreclosure actions which have heretofore been brought by either party hereto, which are now

to get along as one happy family, having seen the sad experience of these other irrigation projects, where the construction company and the operating company continually fought each other. The Bondholders Committee has in many many instances gone beyond their legal liability in making friends with the Canal Company and getting along with them.

. . . . . . . . . . . . . .

"Q. Would you say, Mr. Parry, what you consider their legal liability was?

. . . . . . . . . . . . . .

"A. When stated that, I was using that in a broad sense mostly as to this particular controversy— Going on, I said

pending, or which may hereafter be commenced, in order that clear title may be more readily obtained, that no contest or opposition will be made by the other party, and upon the final determination of the priority of the respective liens as herein defined, the unpaid maintenance with interest as aforesaid, will be paid by the party of the second part or the liens released by the party of the first part, as the case may be.

"(9) That it is the intent and the purpose hereof to hold the question of the relative priority or constitutionality of the liens of the parties hereto in *status quo* until and if the question is finally determined by a Court of competent jurisdiction as herein provided, such question to be so held without either of the parties hereto gaining or losing any rights, privileges, or advantages whatsoever, and with the full power and privilege to the parties to secure a final determination of such question, if the same is not determined in the litigation hereinabove mentioned, and to collect the full amount due according to the fina. determination of the priority the same as though each of the parties hereto had taken all and every necessary and proper step required by law to be taken or performed to initiate, preserve, and enforce the respective liens claimed by them.

"(10) It is mutually understood and agreed that the party of the second part has transferred and assigned certain of the water contracts and notes and mortgages taken in lieu thereof, to Continental and Commercial Trust and Savings Bank, a corporation, and to Twin Falls North Side Investment Company, Limited, a corporation, and that the title to various lands secured by foreclosure of water contracts or notes and mortgages taken in lieu thereof, or acquired by deeds given in lieu of foreclosure, have been taken in the name of said Continental and Commercial Trust and Savings Bank, and Twin Falls North Side Investment Company, Limited, and it is hereby mutually agreed that, wherever in this agreement the term 'party of the second part' is used, it shall be deemed to describe and include the said Continental and Commercial

there was a variety of reasons, as Mr. Hurlebaus testified, the question of the relative priority of these liens has been a question that has been argued and debated since I came to Idaho, and constantly before. The two companies tried for many years negotiating in an attempt to settle it. These payments were made at a time when we thought a settlement could be worked out. There has been a question of transfer involved—

"Q. By transfer, you mean what?

Trust and Investment Company, Limited, a corporation, together with their successors and assigns forever, and that the said two last named corporations, as well as their successors and assigns forever, shall have and exercise every right and privilege herein specially given to the Twin Falls North Side Land and Water Company.

"(11) It is understood and agreed that the Twin Falls North Side Investment Company, Limited, where its interests may appear in the subject matter of this contract, shall be deemed and considered a successor in interest or an assignee of the Twin Falls North Side Land & Water Company, and entitled to whatever rights and privileges may be secured by an assignee or successor in interest of said Twin Falls North Side Land & Water Company.

"(12) That in the event the relative priority or constitutionality of the respective liens claimed by the parties to this stipulation is not finally determined as specified, within three years from the date hereof, then and in that event either party may, at its option, proceed to institute such legal action or actions as it or they may deem fit and proper for the purpose of determining the relative priority or constitutionality of the liens herein defined.

"(13) It is understood and agreed that this agreement shall supersede certain prior stipulations heretofore entered into by and between the attorneys for certain of the parties hereto in certain litigation then pending, and this agreement shall fully operate to fix and determine the rights of the parties in relation to the subject matter hereof.

"(14) In case any question should arise between the parties hereto (or the consenting parties) as to a proper interpretation of this agreement or any part thereof, then either party hereto, or any consenting party, may resort to any Court of competent jurisdiction for the purpose of having the true and correct meaning of this agreement judicially determined.

"IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed in their names by their proper officials, all first duly authorized in the premises, and their respective corporate seals to be hereunto attached, all on the day and year first above written. (Which was duly signed and acknowledged.)

"A. Transfer of water stock off that part of the eleven thousand acres which the test of time would seem to show it would be impossible to farm economically, and there has been a constant discussion, and the defendant company has desired to have the right to transfer the stock off this worthless land established and supply water to other lands, and for a long time we believed that we could arrive at such an arrangement with the Canal Company.

"Q. Has that transfer required the consent of the Canal Company?

"A. Yes.

"Q. Has that consent been granted?

"Mr. STEPHAN: We object to this line of testimony on the grounds and for the reason it is improper sur-rebuttal.

"The COURT: You are speaking of transfer of this water from these lands to other lands?

"Mr. SNOW: Yes, and he said they were hoping to do that, and the question was, if the consent of the canal company was necessary, and he said, it was, and I asked if that consent had been granted?

"The COURT: Well, he may answer, I don't see it is very material.

"A. No, the consent has not been granted. About the time we quit paying this maintenance, we learned they were not going to grant that without litigation, and that is one of the main reasons we changed our policy."

Cross-examination of Mr. Parry on sur-rebuttal:

"Q. Mr. Parry, you were counsel for the Canal Company for a number of years?

"A. Yes.

"Q. Until what time?

"A. December 31st, 1936.

"Q. And as such you commenced the present action to foreclose this lien against what is now the Idaho Farms Company?

"A. In connection with Mr. Barclay, yes sir.

"Q. And you advised the directors of the Canal Company that they had no cause of action when they brought this suit?

"A. I repeatedly said in discussions that this was a de-

bated question—legal question, of their rights and I made that statement many times.

"Q. You had brought such suit before for the Canal Company?

"A. During the time I was counsel, and for a long time before our first foreclosure suits were filed on each piece of land—

"Q. When you started this suit, you considered so, in good faith, believing so as an attorney of this court, you had a cause of action?

"A. No, as I stated before, I stated it was a debated proposition and it was discussed in every meeting, we would take every step to preserve their lien, if any, on the land and water company.

"Q. When you started this action, were you attorney for the Bondholder's Committee, and Canal Company?

"A. Yes, and I so advised them.

"Q. You represented both the plaintiff and the defendant?

"A. Yes, and that was known by both sides all the time.

"Q. This transfer you speak of—

"Mr. SNOW: You appreciate, Mr. Parry is not counsel in this suit. You are not implying he is counsel in this suit?

"Mr. PARRY: I want to state this, when the members of the Canal Board approached me and employed me as their counsel I told them I was counsel for the Bondholder's Committee and if they wanted me to act for their company my first duties was for my first employer, and the employment was taken and terminated with this idea.

"Q. There was no serious controversy between them over the assessments over a long period?

"A. We argued and had two or three settlements set up."

It is thus apparent there is no real disagreement or conflict between Mr. Hurlebaus and Mr. Parry, who alone testified with regard to this contract, that neither party herein considered the contract binding to the extent that by it the controversy herein was settled or made conclusively dependent upon the Portneuf-Marsh case, *supra,* or that other divergent litigation had not ensued. Thus so far as this controversy is concerned critical interpretation of the contract or

its force is obviated because the practical construction placed upon the contract by the parties themselves through their conduct, virtually amounted to an abandonment thereof or at least a cessation of reliance thereon.

The original opinion is adhered to and the petition for rehearing denied.   Costs awarded to appellant.

Ailshie, C. J., and Budge, Morgan and Holden, JJ., concur.